UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONNIE FORD,

      Plaintiff,

                                    Case No. 1:21-cv-212

v.

                                    Hon. Hala Y. Jarbou

STATE FARM FIRE AND CASUALTY
COMPANY,

      Defendant.

_____/

## OPINION

In this diversity action, Plaintiff Ronnie Ford seeks recovery of benefits under a home insurance policy provided by Defendant State Farm Fire and Casualty Company.  Before the Court is State Farm's motion for summary judgment (ECF No. 24).  For the reasons herein, the Court will deny the motion.

## I. BACKGROUND

Ford's home was damaged by a house fire on December 22, 2019.  State Farm was his insurer.  After Ford sought coverage from State Farm, it rescinded its policy, claiming that he had misrepresented a material fact about his utilities on his application for the insurance policy.

### A. Ford's Home

In the early 1970's, Ford's mother purchased a home at 5016 Conners Avenue in Lansing, Michigan.  Ford lived there as a child and for most of his adulthood.  After his mother died in 2007, he took up permanent residence in the home.  He lived there until the date of the fire.

**B. Ford's Utilities**

According to Ford, his electrical, plumbing, and heating systems were "in good condition underwent proper maintenance and were in full working order" until sometime in 2017-2018, when his water heater began leaking while he was away on vacation.  (Ford Decl. ¶ 3, ECF No. 34-2.)  Because of the leak, his utility company charged him over $4,000 for his water bill.  (*Id.*)  He asked the company to provide "accommodations," but it refused.  (*Id.*)  He decided not to pay his water bill.

He replaced his water heater, but in January 2018, the utility company shut off the water and sewer service for Ford's home due to nonpayment of his water bill.  (Ford Dep. 39, 49, ECF No. 25-2.)  A few months later, it also shut off the electricity.  (*Id.* at 41.)  Ford continued living at his home without running water or electricity until the date of the fire.  (*See id.* at 29, 45.)  He occasionally used a gasoline-powered generator to run the freezer in his garage.  (*Id.* at 44-45.)  His furnace needed electricity to operate, so he could not use it to heat his home.  Instead, he used a wood burning fireplace to keep himself warm.  (*Id.* at 50.)  And he used water that he obtained elsewhere to flush his toilets.  (*Id.* at 40.)

**C. Ford's Application for Insurance**

In October 2019, Ford applied to State Farm for a homeowner's insurance policy.  He met with State Farm's agent, Stacy Lewis, to obtain a quote.  She asked him several questions that were written on an electronic form on her computer, and then she entered his answers into the form.  (Lewis Dep. 43, ECF No. 34-3.)  One of the questions she asked is "Are the utilities (including electrical, heating, and plumbing) adequate and properly installed and maintained?" (*Id.* at 66.)  He answered, "Yes." (*Id.*)  She did not provide any further explanation of this question. (*Id.* at 68.)  After he answered, she moved on to the next question.  (*Id.*)  Ford did not mention that there was no running water or electricity in the home at the time (Lewis Dep. 67), but he would

2

have done so if she had asked him about it (Ford Decl. ¶ 13).   He understood the question to be referring to the electrical, heating, and plumbing systems at his house, rather than services that were active or "turned on" by the utility company.  (*Id*.)

Later in the interview, Lewis asked Ford what years his "heating / cooling," "electrical," and "plumbing" were updated.  (*See* Homeowner's Application, ECF No. 25-3, PageID.322; Lewis Dep. 73; Ford Dep. 76.)  According to the application, Ford told her that the plumbing had been updated in 2018.  (*Id.*)

State Farm approved Ford's application and issued him an insurance policy effective October 21, 2019, through October 21, 2020.

**D. Insurance Claim**

After the fire destroyed Ford's home in December 2019, he presented a claim for damages to State Farm.  During an interview with a State Farm representative a few days after the fire, Ford told the representative that his electricity and water had been turned off for about a year.  (Interview Tr., ECF No. 34-7, PageID.603, 605.)

State Farm's claims department recommended that State Farm rescind the policy due to alleged misrepresentations by Ford about his utilities.  According to State Farm, Ford had represented that his utilities were properly maintained when that was not the case.  Underwriting Team Manager Michael Kunkler reviewed and approved this recommendation.  Kunkler testified that State Farm would not have issued the policy if it had known the status of Ford's utilities. (Kunkler Dep. 28, ECF No. 34-4.)  There is an increased risk of loss to property that does not have water and electricity.  (*Id.* at 53.)  State Farm rescinded the policy in July 2020.  (*Id.* at 14.)  Because the rescission was retroactive, State Farm denied Ford's claim for benefits.  Ford subsequently brought this case to recover benefits under the policy.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

State Farm argues that there is no genuine dispute that it was entitled to rescind the insurance contract because Ford committed fraud when applying for insurance.  Rescission is an equitable remedy.  *See Bazzi v. Sentinel Ins. Co.*, 919 N.W.2d 20, 29-30 (Mich. 2018).  As such, it is "'not strictly a matter of right' but is granted only in 'the sound discretion of the court.'"  *Id.* (quoting *Amster v. Stratton*, 244 N.W.2d 201, 202 (Mich. 1932)).  "When a plaintiff is seeking rescission, 'the trial court must balance the equities to determine whether the plaintiff is entitled to the relief he or she seeks.'"  *Id.* at 30 (quoting  *Johnson v. QFD, Inc.*, 807 N.W.2d 719, 727 n.3 (Mich. Ct. App. 2011)).  It "should not be granted in cases where the result thus obtained would be unjust or inequitable, or where the circumstances of the challenged transaction make recission infeasible."  *Id.* (citations and quotation marks omitted).

"[A]n insurer may rescind a policy ab initio because of a material misrepresentation in the application for insurance."  *Burton v. Wolverine Mut. Ins. Co.*, 540 N.W.2d 480, 481 (Mich. Ct. App. 1995).  A misrepresentation is material where "it would have had the effect of 'substantially

4

increasing the chances of loss insured against so as to bring about a rejection of the risk or the charging of an increased premium.'" *Oade v. Jackson Nat'l Life Ins. Co. of Mich.*, 632 N.W.2d 126, 131 (Mich. 2001) (quoting *Keys v. Pace*, 99 N.W.2d 547, 551 (Mich. 1959)).

Michigan law recognizes "several interrelated but distinct common-law doctrines—loosely aggregated under the rubric of 'fraud'—that may entitle a party to a legal or equitable remedy if a contract is obtained as a result of fraud or misrepresentation." *Titan Ins. Co. v. Hyten*, 817 N.W.2d 562, 567 (Mich. 2012).  The theories raised by State Farm are: (1) "actionable fraud, also known as fraudulent misrepresentation"; (2) "silent fraud, also known as fraudulent concealment"; and (3) "innocent misrepresentation." *Id.*

> To have actionable fraud,
>
> it must appear: (1) [t]hat defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury.

*Titan Ins.*, 817 N.W.2d at 567-68 (quoting *Candler v. Heigho*, 175 N.W. 141, 143 (Mich. 1919)).

Silent fraud occurs where this is a legal or equitable duty of disclosure, such that "suppression of the truth is as prejudicial as that which springs from the assertion of a falsehood[.]" *Id.* at 569.  An insurance applicant has a duty to be truthful when applying for insurance. *See Ferris v. Home Life Assur. Co.*, 76 N.W. 1041, 1042 (Mich. 1898).  However, "an insured is not required to disclose information not requested by its insurer[.]" *Ill. Nat'l Ins. Co. v. AlixPartners LLP*, No. 337564, 2019 WL 939018, at *7 (Mich. Ct. App. Feb. 26, 2019).  This is so because "the insurer is assumed to know the extent of the information desired, and to seek it, and cannot avoid liability by claiming there was concealment . . . when it did not ask about such a matter and called for no such information in its written application." *Federal Land Bank of St. Paul v. Edwards*, 247 N.W. 147, 149 (Mich. 1933).  Thus, to prevail under a theory of silent fraud, State Farm must

show that Ford had a duty to disclose the information at issue and that he "suppressed [the truth] with the intent to defraud." *Titan Ins.*, 871 N.W.2d at 569.

An innocent misrepresentation occurs where "'there was in fact a misrepresentation, though made innocently, and its deceptive influence was effective, the consequences to the plaintiff being as serious as though it had proceeded from a vicious purpose[.]'" *Id.* at 568 (quoting *U.S. Fidelity & Guaranty Co. v. Black*, 313 N.W.2d 77, 83 (Mich. 1981)).  Under this theory, even innocent and unintentional misrepresentations by the insured can give the insurer a right to rescind, so long as the insurer relied upon the misrepresentation. *U.S. Fidelity*, 313 N.W.2d at 85.

The first and third theories require an objectively false or misleading statement by the defendant.  State Farm's "subjective misunderstanding of information that is not objectively false or misleading cannot mean that [Plaintiff] has committed the tort of fraudulent misrepresentation." *Hord v. Env't Rsch. Inst. of Mich.*, 617 N.W.2d 543, 549 (Mich. 2000).  The second theory, silent fraud, requires a duty to disclose and the suppression of the truth with intent to defraud.

Here, State Farm contends that Ford misrepresented the status of his utilities.  He knew that the utility company had shut off his water, sewer, and electricity long before he applied for insurance.  Nevertheless, when asked whether the utilities at his home were "adequate, properly installed, and maintained," he responded, "Yes."  State Farm argues that this response meets the requirements of the three forms of common law fraud mentioned above.  In State Farm's view, Ford's utilities were not adequate, properly installed, or maintained because they were not functioning.  And it contends that Ford committed silent fraud by suppressing the fact that his utilities were not active when asked about them.

Ford says that he interpreted Lewis's question differently than State Farm does here.  He understood the term "utilities" to refer to the physical systems or equipment at his home rather

6

than the services provided by the utility company.  So far as he was aware, those systems were adequate, properly installed, and maintained.

The Court agrees with Ford that the question asked by State Farm is sufficiently ambiguous to preclude summary judgment for State Farm.  At the heart of the parties' dispute is the meaning of the term utilities.  That term is susceptible to more than one meaning.  In this context, a utility can refer to "a service (such as light, power, or water) provided by a public utility," or it can refer to "equipment or a piece of equipment to provide such service or a comparable service."  *Utility*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/utility.    Ford understood it to mean the latter.  State Farm apparently understood it to mean the former.  It argues that the utilities were not adequate and properly maintained because there was no water or electricity available in Ford's home.

The language of State Farm's question supports Ford's interpretation.  First, by asking about items that were "installed," the question implies that it is referring to something placed and kept at the home, like equipment or wiring.

Second, the question lists plumbing and heating as examples of utilities.  Plumbing refers to an apparatus that is part of or leads to the home rather than a service provided by a third party.  Similarly, although electricity or gas might be necessary for heating a home, the heating itself occurs through equipment at the home.  It is not a service provided by a public utility.

Third, and relatedly, Ford's interpretation fits the text.  In other words, the question still makes sense after adding the term "equipment" or "system" after the three examples of utilities, i.e., "Are the utilities (including electrical *equipment/system*, heating *equipment/system*, and plumbing *equipment/system*) adequate and properly installed and maintained?"  By contrast, the question does not make sense when the term "service" is added, i.e., "Are the utilities (including

7

electrical *service*, heating *service*, and plumbing *service*) adequate and properly installed and maintained?"  As indicated above, plumbing and heating are not services provided by a utility company.

Fourth, although State Farm claims that it wanted to know whether there was heat, water, and electricity in Ford's home, it did not use those terms or ask about those particular issues. Instead, it asked about the "electrical," "plumbing," and "heating" utilities, and did so in a manner suggesting that it was referring to equipment.  Notably, State Farm used the same terms when asking Ford when his "electrical," "plumbing," and "heating / cooling" were "updated."  That question makes sense only when referring to equipment at the home.

State Farm argues that utilities cannot be adequate and properly maintained when there are none, but that argument simply assumes the conclusion.  It assumes that "utilities" means the services provided by a utility company.  But as discussed above, State Farm's question implied that utilities meant equipment.  It is possible for equipment to be adequate and properly maintained without using them.

In summary, because a reasonable person could interpret State Farm's question as referring to the equipment at Ford's home rather than water, sewer, or electricity services, a reasonable person could also conclude that his response to that question was truthful and not false or misleading.  That conclusion would prevent State Farm from succeeding on the first and third theories of fraud.  Likewise, a reasonable person could conclude that Ford did not intend to defraud State Farm because he truthfully answered the question it asked.  State Farm did not ask him about working electricity or water services.  And it does not contend that it raised any concerns to Ford about the absence of those services and how that would impact its risk assessment.  Accordingly, a reasonable person could conclude that Ford did not commit silent fraud.

State Farm argues that it can prevail under an innocent misrepresentation theory even if there was a mutual mistake about the meaning of its question, citing *Lash v. Allstate Insurance Co.*, 532 N.W.2d 869 (Mich. Ct. App. 1995). That case is distinguishable because it did not involve a dispute about the meaning of the insurer's question, which asked whether the insured had any traffic citations within the last three years. *Id.* at 870. Also, there was no dispute that the insured had misrepresented his driving record. He apparently forgot about a citation for driving a vehicle while impaired and did not disclose it to the insurance company. *Id.* In contrast, Ford plausibly contends that he truthfully answered the question State Farm asked. The language of State Farm's question supports his argument.

For similar reasons, State Farm's reliance on *21st Century Premier Insurance Co v. Zufelt*, 889 N.W.2d 759 (Mich. Ct. App. 2016) is misplaced. There, an automobile insurance company required the insured to have less than 6 points on his driving record to be eligible for an insurance policy. *Id.* at 761. The insured had 7 points, but he obtained an insurance policy by not disclosing 3 points that he had accumulated from a recent accident. *Id.* In other words, he misrepresented his driving record when asked about it. In contrast, there is no evidence that Ford misrepresented the state of the utility equipment at his home. As discussed above, State Farm's argument that Ford made a misrepresentation depends upon its own interpretation of the question it asked him. The Court is not obligated to accept that interpretation where another interpretation is reasonable.

Alternatively, State Farm contends that Ford misled the company when he told Lewis that his plumbing had been updated in 2018, during a time when his water was shut off. That argument suffers from similar defects as the argument about Ford's utilities. State Farm was plainly referring to the attributes of the equipment in Ford's home. It was not referring to the services provided to the home, such as electricity or water service, or to whether those services were active. And State

Farm offers no evidence that would require the Court to conclude that Ford's response was false or misleading, that he intended to defraud State Farm, and that there is no genuine dispute of material fact for trial.

### IV. CONCLUSION

For all the foregoing reasons, State Farm is not entitled to summary judgment. Accordingly, the Court will deny its motion.

The Court will enter an order consistent with this Opinion.


Dated: <u>November 7, 2022</u>                    <u>/s/ Hala Y. Jarbou</u>
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE